SPIKING et al. v. CONSOLIDATED. RY. & POWER CO. et al.

No. 1874. Decided January 25, 1908 (93 Pac. 838).

1. STREET RAILROADS — DEATH OF PEDESTRIAN — CARE REQUIRED. A person crossing a street in front of an approaching street car is not required to use the same degree of care as persons traveling along, on, or across a steam railroad.[1]

2. SAME—CROSSING TRACKS. A pedestrian desiring to take a street car standing on an opposite track was entitled to hastily cross an intervening track on which a car was approaching, provided he exercised ordinary care for his own safety in view of the surroundings.

3. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. Evidence *held* to require submission to the jury of the issue of the contributory negligence of a pedestrian, struck and killed by an approaching street car as he was crossing the track.

4. SAME—EVIDENCE—REPUTATION FOR CARE. Where, in an action for the death of a pedestrian in collision with a street car, there were several eyewitnesses to the occurrence who testified, evidence that decedent was a careful and cautious man was inadmissible.

5. TRIAL—RECEPTION OF EVIDENCE—NECESSITY OF OBJECTION—MOTION TO STRIKE—DISCRETION. In an action for the death of a pedestrian by collision with defendants' street car, plaintiffs' counsel asked a witness how decedent was as to being a careful and

---

[1] Hall v. Ry. Co., 13 Utah 243, at page 258, 44 Pac., at page 1046, 57 Am. St. Rep. 726; Thompson v. S. L. Rapid Tr. Co., 16 Utah 289, 52 Pac. 92, 40 L. R. A. 172, 61 Am. St. Rep. 621.

cautious man. The witness answered, without objection, that he was careful, when defendants moved to strike the answer, and excepted to the court's refusal to do so. *Held*, that as the question indicated on its face that it called for incompetent evidence, in the absence of an objection to it, it was not an abuse of discretion to refuse to strike the answer.

6. SAME—INSTRUCTIONS—ASSUMED FACTS—JUDICIAL NOTICE. Where the fact that fenders were generally used on street cars was treated as a matter of general knowledge, of which the court would take judicial notice, and proof thereof was excluded for that reason, the court was entitled to assume that such fact existed, in its instructions, as if it had been proved.

7. APPEAL—RIGHT TO ALLEGE ERROR—INCONSISTENT POSITION. Where defendants objected to evidence to show that street cars generally were equipped with fenders, because the matter was one of general knowledge, they could not object on appeal that an instruction, in which the court took judicial notice of such fact, was erroneous because of the absence of evidence thereof.

8. STREET RAILROADS—INJURY TO PERSONS ON TRACK—INSTRUCTIONS. Defendants, having objected to evidence that street cars generally were equipped with fenders, on the theory that such fact was a matter of common knowledge, which objection the court sustained, requested an instruction that there was no evidence that at the time of the accident fenders were in general use, and that there was no proof of negligence because the car that struck decedent was without a fender. The court charged that, if the jury found that the car did not have a fender, they could not find against defendants on that alone, unless they also found that, if the car had a fender, the "accident" might have been averted thereby. *Held*, that the term "accident" having been used in the instructions and evidence to refer to the collision itself, the instruction given in effect told the jury that the fender was *not* in the case as effectually as if the word "collision" had been used.

9. SAME—APPLIANCES—CARE REQUIRED. A street railway company is only required to adopt methods, machinery, and appliances in accordance with the ordinary usage of the business.[1]

10. SAME—SAFETY APPLIANCES—GENERAL USE. The rule that it is necessary to prove that certain appliances are in general use by street railway companies before negligence can be predicated on the omission to supply them does not apply to appliances, the use of which is a matter of common knowledge.

11. WORDS AND PHRASES—"FENDER." As applied to street railway cars, a fender is a guard or protection against danger to pedestrians coming in contact with a car.

---

[1] Fritz v. Electric Light Co., 18 Utah 493, 56 Pac. 90.

12. EVIDENCE—JUDICIAL NOTICE—FENDERS ON STREET CARS. Where negligence, in an action for death of a pedestrian by being struck by a street car, was predicated entirely on the omission to provide the car with any fender or guard whatever, the court was entitled to take judicial notice of the purpose of fenders, as applied to street cars; such appliances being in common and general use on street cars.

13. STREET RAILROADS — DEATH OF PEDESTRIAN — CARE REQUIRED. Where decedent was killed in a collision with a street car, and the court called attention to the particular circumstances of the case, an instruction that decedent was required to use his senses, and exercise that degree of care that men of ordinary prudence would have exercised under the particular circumstances of the case as disclosed by the evidence, was not objectionable as requiring too low a degree of care, in view of evidence that decedent was familiar with the surroundings and conditions prevailing at the place of the accident.

14. SAME. Where the court repeatedly charged that decedent was required to use all his senses to avoid collision with a street car by which he was killed, and that, unless he did so, plaintiffs could not recover, an instruction was not objectionable in the use of the expression "observing the car," instead of requiring decedent to have "looked for the car" before attempting to cross the track.

15. SAME—CROSSING STREETS—PLACE. Where decedent was killed in a collision with a street car, as he was crossing the track, at a point some distance from a street crossing, but at which a large number of persons habitually crossed the track, an instruction that he was entitled to rely on the assumption that the company and its servants would discharge their legal duty in approaching crossings by having their cars under control was not objectionable because the accident did not happen at a public crossing.

16. SAME—DUTY OF RAILWAY COMPANY. Where a point in a street some distance from a crossing was habitually used by a large number of persons in crossing the tracks of a street railway, it was the duty of the railway company to conform the movements of its cars to such condition and to approach such point with the same degree of care it was required to approach street crossings.

17. SAME—RIGHTS IN STREETS. Where a street railway company is authorized to lay its tracks on a street, no part of the street is thereby withdrawn from the use of the public, the street being merely burdened with an additional easement in favor of the street railway company, with a preferential right of passage over it.

18. TRIAL—INSTRUCTIONS—REQUESTS. It is not error to refuse requests to charge which are covered by instructions given.

19. DEATH—DAMAGES—LOSS OF PROFITS. In an action for wrongful death, an instruction authorizing consideration on the question of

damages only of the income from property which decedent's skill, personal supervision, and diligence had a part in producing was not objectionable as authorizing consideration of profits arising out of decedent's business.

APPEAL from District Court, Third District; M. L. Ritchie, Judge.

Action by Emeline Spiking and others against the Consolidated Railway & Power Company and another. Judgment for plaintiffs, and defendants appeal.

AFFIRMED.

*P. L. Williams, G. H. Smith,* and *J. G. Willis* for appellants.

*Powers & Marioneaux* for respondents.

### APPELLANT'S POINTS.

To say, or to prove, that a man is ordinarily cautious and careful, constitutes no evidence whatever that at a particular time he was not negligent, because one may be ordinarily both cautious and prudent, and upon a given occasion fail to be either.

Evidence, therefore, that either the plaintiff or the defendant was ordinarily of careful or cautious habits is incompetent and wholly inadmissible. (1 Elliott on Evidence, sec. 186, p. 269; *Konold v. Railroad,* 21 Utah 379; *Adams v. Railroad,* 93 Ia. 565, 61 N. W. 1059; *Railroad v. McClesh,* 115 Fed. 268; *Railroad v. Converse,* 139 U. S. 469; *Glass v. Railroad,* 94 Atl. 581, 10 So. 215; *Chase v. Railroad,* 77 Me. 62, 52 Am. Rep. 744; *Carr v. Railroad,* 163 Mass. 360, 40 N. E. 185; *Towle v. Pacific Improvement Co.,* 98 Cal.—)

The settled rule as respects appliances and the test of negligence in that regard is: were the appliances adopted such as were used and adopted generally and prevailing among prudent and skilful persons or concerns engaged in the same line of business. Whether they were or not depends upon proof as to what appliances are used and adopted among well regulated concerns as they are operated by prudent and skilful

persons in that business, and is not a question that the jury
can decide for itself, without proof as to how skilful and pru-
dent operators usually conduct their business. (*Fritz v. Elec-
tric Light Co.,* 18 Utah 493; 1 Labatt on Master and Ser-
vant, sec. 44; *Titus v. Railroad,* 136 Pa. 618, 20 Atl. 517;
*Railroad v. Allen,* 78 Ala. 494; *Coal Co. v. Brownlie,* 60 Ark.
582, 31 S. W. 453; *Prybilski v. Railroad,* 98 Wis. 413, 74 N.
W. 117; *Balhoof v. Railroad,* 106 Mich. 606, 65 N. W. 592;
*Cook v. Bell,* 20 Sc. Sess. Cas. [2d Series] 137; *Finnigan v.
Peters,* 23 Sc. Sess. Cas. [2d Series] 260; *Railroad v. Hall,*
91 Ala. 112, 8 So. 371; *Guinard v. Knapp-Stout & Co.,* 95
Wis. 482, 70 N. W. 671.)

Over objection of the defendants, Mrs. Spiking was per-
mitted to testify as to the number of teams owned and em-
ployed in Mr. Spiking's business, at the time of the latter's
death, and also, was permitted to testify, over defendant's ob-
jection, what his income was from these teams a day. This tes-
timony was clearly error, as will be shown from the authorties,
not only upon the ground of its uncertain and speculative char-
acter, but because there was no pleading of special damage,
and a damage to property or business would, of course, be
special damage, and not such as would naturally result from
personal injury. (*Weir v. Railroad,* 188 N. Y. 416; *Master-
ton v. Mt. Vernon,* 58 N. Y. 395; *Goodhart v. Railroad,* 117
Penn. St. 1, 55 Am. St. Rep. 705; *Bierbach v. Rubber Co.*
[Wis.], 11 N. W. 514; *Silsby v. Mich. Car Co.* [Mich.], 54
S. W. 761.)

That one must not only look for a car before stepping upon
the track, but must also be held to have seen that which was
obvious is so well settled that we call the court's attention
to but a very few of the innumerable cases that might be
cited: *Cawley v. Railroad,* 101 Wis. 145, 77 N. W. 179;
*Boring v. U. I. Co.,* 61 Atl. 77; *Young v. Railroad,* 148 Ind.
54, 44 N. E. 927; *Thorsell v. Railroad,* 82 Ill. App. 375; *Mc-
Carty v. Railroad,* 120 Mich. 400, 79 N. W. 631; *Walkins
v. Union Traction Co.,* 194 Pa. St. 564, 45 Atl. 321; *Fitz-
gerald v. Railroad* [Mass.], 80 N. E. 224; Nellis on Street
Surface Railroads, p. 365, and cases cited

## RESPONDENT'S POINTS.

"Evidence is received (in cases of death by wrongful act) in regard to many matters which, in actions for personal injury, are irrelevant and immaterial. The age, health, occupation, means, habits, capacity, education, temperament, character and other similar facts relating to the deceased were admissible as tending to show her probable pecuniary usefulness to the beneficiary." (*Skatlane v. Railroad,* 30 Pac. 222; *Hayes v. Williams,* 30 Pac. 352; *Carlson v. Railroad Co.,* 28 Pac. 497; *Tertu v. Railroad,* 46 N. W. 897; *Railroad v. Long,* 24 L. R. A. 637; *Railroad v. Gilmore,* 53 S. W. 61; *Railroad v. Perkerson,* 38 S. E. 366; *James v. Railroad,* 92 Ala. 235, 9 So. 335; *Oakes v. Railroad Co.,* 49 Atl. 418.)

Unlike steam cars, the electric cars run or may be run at times, through streets crowded with vehicles and people and therefore instead of being vested with the right to run at a rapid rate of speed, they are required to make a reasonable use of the streets consistent with the rights of other persons and vehicles, who may occupy the street in conjunction with them. (*Benjamin v. Railroad,* 160 Mass. 3, 39 Am. St. 446; *Commonwealth v. Temple,* 14 Gray, 69, 75; *Fairbanks v. Railroad,* 95 Me. 78, 49 Atl. 421; *Warren v. Railroad,* 95 Me. 115, 49 Atl. 609; *Marden v. Railroad,* 100 Maine 41, 109 Am. St. 479; *Robbins v. Railroad,* 165 Mass. 30, 42 N. E. 334; *Benjamin v. Railroad,* 160 Mass. 3, 39 Am. St. 446; *Traction Co. v. Scott,* 58 N. J. L. 682, 55 Am. St. Rep. 620, 33 L. R. S. 122; *Wendall v. Railroad,* 91 N. Y. 429; *Marden v. Railroad,* 100 Me. 41, 109 Am. St. 484; *Railroad v. Whitcomb,* 14 C. C. A. 183, 66 Fed. 915; *White v. Railroad,* 167 Mass. 43, 44 N. E. 1052; *Evers v. Traction Co.,* 176 Pa. St. 376, 53 Am. St. Rep. 674; *Railroad v. Gentry,* 147 Ind. 408, 62 Am. St. Rep. 421.)

"It is the settled law that one must object to improper testimony when it is offered or abide by the result. The failure to object at the proper time waives the error." Citing Jones on Evidence, sec. 898. (*Huges v. Ward,* 38 Kan. 452, 16 Pac. 810; *Railroad v. Wynant,* 134 Ind. 681, 34 N.

E. 569; *Dallmeyer v. Dallmeyer* [Pa.], 16 Atl. 72; *Railroad v. Kern,* 9 Ind. App. 505, 36 N. E. 381; *Perkins v. Quarry Co.* (Com. Pl.), 32 N. Y. Supp. 230; *Haverly v. Elliott,* 39 Neb. 201, 57 N. W. 1010; *Well Co. v. Vermillion* [S. D.], 61 N. W. 802.)

"Two of the exceptions argued relate to the refusal of the court to strike out certain evidence which was not objected to when offered. Without discussing the question whether the evidence should have been received, had timely objection been interposed, it is sufficient to say that the rule is well settled that a refusal to strike out, in such circumstances, is not error." (*Bailey v. Warner,* 118 Fed. 395; *Prentice v. Goodrich,* 36 N. Y. S. 740; *Barnes v. Christofferson,* 62 Minn. 318; *Wilson v. Northern Pac.,* 26 Minn. 278; *Gran v. Houston,* 45 Neb. 813; *Martin v. Block,* 24 Mo. App. 60; *Railroad v. Owen,* 8 Kan. 409; *Pescia v. Societa, etc.,* 86 N. Y. S. 952; *Mollineaux v. Clapp,* 90 N. Y. S. 880; *Cronk v. Railroad,* 123 Iowa, 349; *McGarrity v. Railroad,* 25 R. I. 269, 55 Atl. 718; *Slatterly v. Slatterly* [Iowa], 95 N. W. 201; *Harvesting Co. v. Carpenter* [Neb.], 95 N. W. 617; *Poehlman v. Kertz,* 204 Ill. 418, 68 N. E. 467; *McMartin v. Corascaden* [Mont.], 86 Pac. 35; *Poindexter & Oregon L. S. Co. v. Railroad* [Mont.], 83 Pac. 887; *Coal, Coke & Iron Co. v. Nichols* [Ala.], 39 So. 762; *Telegraph Co. v. Hope,* 11 Ill. App. 289; *Gurley v. Park,* 135 Ind. 440, 35 N. E. 279; *Railroad v. Champion,* 9 Ind. 510, 53 Am. St. 357; *Campbell v. Connor,* 15 Ind. App. 23, 43 N. E. 688; *Palmer v. Wicherly,* 15 Neb. 98, 17 N. W. 734; *Hall v. Ernest,* 36 Barb. 585; *Oswald v. Kennedy,* 48 Pa. 9; *Lowery v. Robinson,* 141 Pa. 189, 21 Atl. 513; *Montgomery v. Cunningham,* 104 Pa. 349; *McCoy v. Munro,* 78 N. Y. S. 849; *Parker v. Paine,* 76 N. Y. S. 942; *Treschman v. Treschman* [Ind. App.], 61 N. E. 961; *Tuttle v. Wood* [Iowa], 88 N. W. 1056; *Watts v. Howard* [Minn.], 72 N. W. 840; *Larson v. Kelley* [Minn.], 75 N. W. 13; *Fulton v. Ryan,* 60 Neb. 9, 82 N. W. 105; *Murphy v. McCarthy* [Iowa], 78 N. W. 819; *Wysor Land Co. v. Jones* [Ind.], 56 N. E. 46; *Pittman v. Pittman* [Ala.], 27 So. 242; *Railroad v. Bryan* [Texas], 27 S. W. 234; *Linn*

*v. Russell,* 42 New York, 256; *Platner v. Platner,* 78 New
York 90.)

FRICK, J.

This is an action for damages for personal injuries resulting
in death.    The plaintiffs, respondents in this court, are the
widow and minor children of the deceased, Thomas W. Spik-
ing, who, in August, 1902, was fatally injured by a street car
while attempting to cross the street railway tracks on one
of the streets in Salt Lake City.   The acts of negligence
charged against the defendants, appellants here, are:    The
omission to sound a gong or ring a bell, or to give any warning
of the approaching car; the omission to have the headlight
on the car lighted, and in omitting to have any lights on the
car; the omission to have the car provided with a fender or
guard of any kind; operating the car at a high and reckless
rate of speed with the brakes released, and not having the
car under the control of the motorman or any other person
while approaching and passing onto a certain switch, the
place of the accident, and in omitting to look and ascertain
whether the track was clear and free from persons passing
to and fro at the point of the accident.   The evidence is very
voluminous, over thirty witnesses having been examined, a
number of whom were eye witnesses to the accident; and, as is
usual, there is a conflict with regard to just how and when
certain matters occurred, and with regard to the existence or
nonexistence of others.    From a careful reading of the en-
tire transcript of the evidence, the following facts may be
said to be fairly established:   The point, or immediate vicin-
ity, of the accident, is one of the principal business centers
of Salt Lake City.   The accident occurred on East Second
South street, about eighty-five feet east of the east crossing of
Main street, at which crossing the two streets intersect.   At
the time of the accident the appellants operated cars on three
tracks on East Second South street running parallel, two of
which continued west across Main street, and the third, being
the north track, terminated at the point of the accident in a
switch which connected it with the middle one of the tracks

mentioned. The north rail of the northerly track was twenty-eight feet south of the north curb of East Second South street. At the time of the accident there was no overhead or trolley wire connecting the north with the middle track, and the cars going west on the north track were switched onto the middle track by what is termed a "flying switch," which was accomplished by the momentum acquired by the car in approaching the switch. On the north and middle tracks the cars went west, while on the south track they went east. On the night of the accident, August 16, 1902, the car on the north track was due at the switch at twenty minutes past 10 o'clock, but arrived at that point at about eighteen minutes past 10. As the car was approaching westerly toward the switch, the deceased was seen by a number of witnesses to start from the north curb on Second South street, thence going in a southerly direction toward a car just starting east on the south track, which car would pass his home. Two witnesses testified on behalf of appellants, who were passengers on the car that struck the deceased, which was an open or summer car, that they saw the deceased start from the point stated, and saw him running or going hastily south towards the car on the south track. In the course the deceased was going he would cross the north track at the switch, and when he arrived there the car in question had also arrived at the switch, and the deceased collided with the front end of the car, which knocked him down, and he fell under the car, and the wheels of the rear trucks passed over one of his legs and one foot, crushing them, so that in a few days thereafter he died from the effects of the injuries. A number of witnesses testified that the car was running at a high rate of speed in approaching the switch, others said it was running faster than usual, while the motorman testified that it was moving at from 4½ to six miles an hour. All the witnesses concur that no gong or bell was sounded, nor any warning of the approach of the car given. Some of the witnesses testified that there was no lighted headlight on the car, and all agree that just before the collision, or at the instance at which it occurred, all the lights in the car went out. The

33 Utah-21

current was cut off at the time on account of the trolley leaving the north wire in making the cross-over from the north to the middle track, and the brakes were released so as not to arrest the speed of the car in making the cross over. The motorman did not look for nor see the deceased until the instant he was struck by the car, at which time the power was off, and the only way the speed of the car could be checked was by means of the hand brake, which the motorman applied. There were lights in the streets, and other lights from the surrounding business houses, so that the car could have been seen and was seen approaching from the east. The car was not provided with a fender or any guard. The Main street crossing across the tracks for pedestrians was about eighty-five feet west of the switch where the accident occurred, but a large number of people habitually crossed the tracks at the point of the accident and immediately to the east thereof. A considerable number of people were about the place at the time of the accident, not directly at the switch, but near there, to the north and south of it. The cars on all the tracks habitually stopped just east of the Main street crossing to receive and discharge passengers. There is some evidence that the deceased, to some extent at least, was familiar with the conditions prevailing at and about the switch as outlined above. Whether the deceased saw the car approaching does not directly appear. It does, however, appear that he was hurrying to catch the outgoing car. At the time of the accident there was also a car approaching from the east on the middle track some little distance in the rear of the car on the north track. Upon substantially the foregoing facts, the court submitted the case to the jury, who returned a verdict for respondents, upon which a judgment was duly entered. A motion for a new trial having been duly made and overruled, the appellants prosecuted this appeal.

A great number of errors are assigned, but as counsel have condensed them in their brief and in their oral argument, we shall consider those only that are relied upon in the argument.

The first alleged error we shall consider is the one present-
ed last in the brief, but, as it logically comes first, we shall
reverse the order.  It is urged that the court erred in refusing
to direct a verdict for the appellants upon the ground that
the deceased was guilty of contributory negligence as a mat-
ter of law.  In support of this contention it is asserted that
the facts of this case bring it within the rule of *Teakle v.
San Pedro, L. A. & S. L. Ry. Co.* (Utah), 90 Pac. 402, 10
L. R. A. (N. S.) 486, in which we held that a person, while
walking along the railway tracks in the yard of the railway
company and stepping in front of a moving train of cars with-
out looking or listening when he knew the cars were being
moved, was guilty of negligence as matter of law.  It is con-
tended that the uncontradicted testimony in this case is to
the effect that the deceased by the exercise of ordinary care
could have seen the approaching car in time to avoid the acci-
dent, and that, as matter of law, he must be held to have seen
it, and that, therefore, he was guilty of negligence in attempt-
ing to cross the track ahead of the approaching car.  That
the car could have been seen approaching from the east for
a distance of nearly a block there is little, if any room for
doubt.  That the deceased was required to exercise ordinary
care for his own safety, and to that end make use of all of his
faculties for seeing and hearing, no one questions;  but
whether he was required to exercise the same degree of care in
attempting to cross a street railway track as in making a
similar attempt with regard to a steam railroad, the author-
ities differ.  Some of the cases cited by counsel for appel-
lants, namely, *Cawley v. La Crosse City Ry. Co.*, 101 Wis. 145,
77 N. W. 179, and *Young v. Citizens' St. Ry. Co.*, 148 Ind.
58, 44 N. E. 927, 47 N. E. 142, and perhaps a few others, hold
to the doctrine that the degree of care on the part of the ped-
estrian is the same in both cases—that is, that he must both
look and listen—and in one case, at least, it is held that he
must also stop to do so before crossing a street railway track.
But the overwhelming weight of authority, including the
decisions of this court, is to the contrary.  It would seem to
require but slight reflection to realize that, in the nature of

things, there must be considerable difference between an attempt to cross a street railway and a steam railway, or in passing along the tracks of the one or the other. Without stopping to point out all the differences, we may be permitted to call attention to one of the fundamental differences between street and steam railways. The part of the street on which a street railway track is laid, and over which cars are operated, is not withdrawn from public use and travel. The rights and duties of the public and the street car operatives are mutual and reciprocal. The only right that the operators of a street railway possess over the public generally is a preferential right of passage over the tracks with the cars, and that between public crossings it is always the duty of the pedestrian or the person driving a vehicle to see to it that he does not impede the street car. But the street car company, in operating its cars, must likewise at all times and places exercise ordinary care so as not to injure any one who may be on or near the track, and at public crossings must have its cars under the control of the operator, and must exercise reasonable care to have them so in approaching the crossings; the decree of care to be exercised always depending upon the prevailing circumstances and conditions. As a general rule, therefore, where a collision occurs between a person lawfully using the street and a street car, the question as to whether the operator or such person, or both, were exercising the degree of care that the law imposes is a question of fact depending upon all the surrounding circumstances and conditions. The reciprocal rights and duties of persons and street railway companies in the use of the streets is well expressed in *Campbell v. Los Angeles Tr. Co.,* 137 Cal. 565, 70 Pac. 624, where, at page 566 of 137 Cal., page 625 of 70 Pac. it is said:

"But, as has been frequently held by this court, the same character of care is not demanded of one crossing a street railroad, where cars are frequently passing at a slow rate of speed and can be easily controlled, as is demanded of one crossing an ordinary steam railroad running through the country, on which heavy trains, difficult to control, go at stated times with great speed. With respect to a street railroad, the mere fact that a person attempts to cross it when a car is

seen to be approaching does not of itself constitute negligence. . . . Ordinarily, whether or not he (the person crossing) was negligent in attempting to cross, under the circumstances of the case, is a question for the jury."

The same thought is expressed in *Hall v. Ry. Co.,* 13 Utah, 258, 44 Pac. 1049, 57 Am. St. Rep. 726, in the following language:

"Persons traveling on the public street, along or across a street railway track, are not held to the exercise of the same degree of care and precaution as they are when traveling along, or upon, or across the ordinary steam railroad."

To the same effect is *Thompson v. S. L. Rapid Tr. Co.,* 16 Utah 289, 52 Pac. 92, 40 L. R. A. 172, 67 Am. St. Rep. 621. The case of *Marden v. Portsmouth, etc. R. Co.,* 100 Me. 41, 60 Atl. 530, 69 L. R. A. 300, 109 Am. St. Rep. 476, is a well-considered case, in which a large number of cases of this class are reviewed, and where the Utah cases are cited with approval. In *Benjamin v. Holyoke St. Ry.,* 160 Mass. 3, 35 N. E. 95, 39 Am. St. Rep. 446, in referring to this subject, it is said:

"The use of the street for electric cars and by the general public was concurrent; and the defendant (the company) was bound, in using the street, to have reference to its reasonable use by others."

We have examined a large number of cases, and, from the decisions, we are forced to the conclusion that, where the conditions and circumstances are as they were in the case at bar, the question of negligence is within the province of the jury. in addition to the cases already mentioned, we cite the following well considered cases: *Robbins v. Springfield St. Ry.,* 165 Mass. 30, 42 N. E. 334; *Newark Pass. Ry. v. Black,* 55 N. J. Law 611, 27 Atl. 1067, 22 L. R. A. 374; *Lawler v. Hartford St. Ry.,* 72 Conn. 74, 43 Atl. 545; *Shea v. St. Paul City Ry.,* 50 Minn. 395, 52 N. W. 902; *Holmgren v. Twin City Rapid Tr. Ry.,* 61 Minn. 85, 63 N. W. 270; *Clark v. Bennett,* 123 Cal. 275, 55 Pac. 908; *McClain v. Brooklyn Ry.,* 116 N. Y. 459, 22 N. E. 1062; *Copeland v. Met. St. Ry.* 67 App. Div. (N. Y.) 483-485, 73 N. Y. Supp. 856.

The law required that the deceased exercise ordinary care for his own safety. To this end he was required to make use of all of his senses to avoid injury. Did he meet this legal requirement at the time and place of the accident? It is easy enough to assume, when viewing the matters retrospectively, that one has failed in this, that, or the other thing, and, if he had not so failed, he would not have been injured. In view of all the circumstances, may not reasonable men differ with regard to his conduct, as disclosed by the evidence, just before and at the time of the accident? May not, likewise, reasonable men draw different conclusions from the conceded facts? The deceased had a right to cross the track in an attempt to board the street car on the southerly track. He had a right to do so even hastily, provided he exercised ordinary care for his own safety in view of his surroundings. He may have seen the car on the north track approaching from the east. He may have assumed that it would reduce its speed on nearing the cross-over switch. But whether he saw it or not, the jury had a right to determine from all the facts whether or not he acted with reasonable care, and whether the motorman, in approaching the switch, did likewise. Moreover, as the car was approaching a place where a considerable number of persons habitually crossed the track, a place near the public crossing on Main street, and immediately east of which the cars habitually stopped to take on and discharge passengers, the deceased might have assumed that, if the motorman intended to make the cross-over without reducing the speed of the car, he would give some warning of his intention to do so. If the motorman had done either, it is quite probable that the accident would not have occurred. Under all these circumstances, it was a question of fact for the jury to say whether the deceased was guilty of negligence which directly contributed to the accident. Even an error of judgment by the pedestrian, based upon some act or duty required of the company or its servants may be taken into consideration in determining who is in the wrong. This is well illustrated in the case of *Copeland v. Met. St. Ry.*, supra, where a woman, in attempting to cross a street car track ahead of an approaching

car which she saw coming toward the point where she intended to cross, was struck and injured while in the act of crossing. The court, in referring to her conduct, used this language: "Her judgment that she could cross in safety was in fault only because of the fact that the motorman had decided not to stop in answer to the signal, 'Slow down;' nor did he, by the ringing of a bell, notify her of his intention." The car in that case was signaled to stop by the woman's son. It was a car which did not stop at the particular point, and proceeded on its course, and reached the point where the woman crossed the track in less time than she had calculated, and was injured by reason of this miscalculation. The case of *McClain v. Brooklyn Ry.*, supra, is likewise one where the facts and circumstances were in some respects similar to those at bar; and in that case it was also held that the conduct of the parties involved questions of fact to be determined by the jury. It may be that in some of the cases the conduct of the pedestrian may be of such a character that the question is one of law merely. The case of *Boring v. Union Trac. Co.*, 211 Pa. 594, 61 Atl. 77, affords an illustration of that class. There the injured person walked along the side of the street railway track ahead of an oncoming car, and, without looking, suddenly stepped onto the track in front of the car, and was struck and injured. It was held that the injured person was negligent as a matter of law. We are, however, not dealing with such a case. In this case there were many matters to be considered, on at least some of which reasonable men might arrive at different conclusions. The *Teakle Case,* supra, was entirely different in this respect from the case at bar. There only one conclusion was permissible from the conceded facts; and hence it was a question of law, and was decided as such. We are convinced that the court committed no error in submitting the case to the jury.

The next assignment to be noticed, briefly stated, arises as follows: Mrs. Spiking, one of the respondents, testified as a witness in the case, and, before the respondents rested, counsel for appellants asked leave to recall her for further cross-examination. After this was concluded, her counsel proposed to

ask her a further question upon a matter which he said was
not proper on redirect, but desired to ask it because it had been
overlooked. No objection being made, counsel asked the fol-
lowing question: "How was Mr. Spiking as to being a careful
and cautious man?" The witness answered: "Yes, sir; he
was very careful." Counsel for appellants offered no objection
to the question, but immediately after the answer moved to
strike it out as "irrelevant, immaterial and incompetent."
The court denied the motion, and permitted the answer to
stand. Counsel for appellants now urge that the court erred
in refusing to strike out the answer. That the evidence of the
character contained in the foregoing answer is improper in
view of all the evidence in the case must be conceded. This is
well illustrated by the following authorities: *Adams v. C. M.
& St. P. Ry.*, 93 Iowa, 565, 61 N. W. 1059; *Louisville Ry. Co.
v. McClish,* 115 Fed. 268, 53 C. C. A. 60; *Glass v. Memphis
& C. Ry.,* 94 Ala. 591, 10 South. 215; *Chase v. Maine C. Ry.,*
77 Me. 62, 52 Am. Rep. 744; *Towle v. Pac. Imp. Co.,* 98 Cal.
342, 33 Pac. 207. Some of the authorities are to the effect
that, where there are no eyewitnesses in a case of death by ac-
cident, such evidence is proper. (1 Shear. & Redf., Ev. [5th
Ed.], section 111; 1 Elliott, Ev. section 217.) Conceding the
evidence to be improper, can this court review the alleged error
in view of the state of the record? The question was one
propounded immediately after opposing counsel's attention
was directed to the fact that the question would be asked out of
the regular order. The question upon its face was one that in-
dicated what the character of the answer thereto would be. The
answer of necessity would be that deceased was either a careful
man or a careless man. If the answer was that he was a care-
ful man, then appellants' counsel did not want it, and, if it
had been to the contrary, respondents' counsel would have been
opposed to it. But either way the testimony was improper.
This is always the result, with regard to improper testimony,
under conditions as above indicated; and in view of this the
courts have evolved and adopted a rule of practice which is
that where the question fairly indicates what the nature of the
answer will be, then the adverse counsel must object to the

question and obtain a ruling, and save an exception to make the error, if any be committed, available in a court of review. Error may not be predicated upon a denial of the motion alone. This rule is well stated in *People v. Williams,* 127 Cal. 216, 59 Pac. 583, in the following words:

"When it is apparent from the question that the answer will contain evidence necessarily inadmissible, then the motion to strike out comes too late, unless preceded by an objection to the question; but the rule is otherwise when the evidence may, or may not, be admissible."

The authorities are numerous to this effect, and among which we refer to the following: *Taylor v. State,* 100 Ala. 68, 14 South. 875; *Way v. Johnson,* 5 S. D. 237, 58 N. W. 552; *Wendt v. R. Co.,* 4 S. D. 476, 57 N. W. 227; *Cleveland C., C. & I. Ry. Co. v. Wynant,* 134 Ind. 681, 34 N. E. 569; *Gran v. Houston,* 45 Neb. at page 836, 64 N. W. 245; *McClellan v. Hein,* 56 Neb. 600, 77 N. W. 120; 3 Jones on Ev., section 898; 22 Pl. & Pr. 1310. In the foregoing cases, excepting those from Nebraska, where the record is like the one before us, it is held that the alleged error is not reviewable. In Nebraska, however, it is held that the motion to strike out is always addressed to the sound legal discretion of the trial court, and that a clear abuse of this discretion is always reviewable. If we adopt the rule generally recognized, we cannot review the alleged error, because under that rule a failure to object to the question waives the error. What would be the result if we should adopt the Nebraska rule? Has the trial court so clearly abused his legal discretion that, in view of the state of the record, error may be predicated thereon? When the motion to strike out was made, counsel for appellant offered some excuse for not making an objection before the question was answered. Whether the excuse was well founded depended upon the circumstances, all of which occurred in the presence of the court, and he necessarily deemed the excuse insufficient. We arrive at this conclusion from

the fact that at various times during the trial, where answers had been made before an objection either was or apparently could have been interposed, the court permitted .counsel on both sides to make objections, obtain rulings thereon, and take exceptions, so that the point could be reviewed by this court. In this instance no such permission was asked. If we attempted to review the action of the court from this point of view, we would have to hold that in the light of the record the court did not abuse its discretion in denying the motion to strike out the answer. We do not wish to be understood as holding that in no case where improper evidence was elicited in this way, which in and of itself either made a case or stated a defense it would not be held that the action of the trial court in denying a motion to strike out, when timely made, would not be reviewed. In such a case the record upon its face might show an abuse of discretion. Such is not the case before us, and therefore this assignment cannot be sustained.

The remainder of the assignments all refer to the instructions. In passing upon those alleged errors the length of the instructions makes it impracticable to set them forth in full. We, therefore, can do no more than to refer to the particular parts of which complaint is made. The instructions given by the court cover twenty typewritten pages of legal cap, and the requests cover twenty-one pages in addition to those given. There are many exceptions to those that were given, and many more to the refusal of requests not given.

The first assignment to be noticed relates to the refusal to give two special requests offered by appellants, and in the giving of an instruction upon the same subject by the court. In the complaint negligence was predicated upon the failure of appellants to equip the car with a fender or guard of some kind. At the trial respondents produced a witness who had been employed as a motorman and gripman for a period of nearly eight years on cars propelled by electricity and cable in various cities from Chicago to the Pacific Coast, including Salt Lake City. Counsel for respondents asked the witness -whether or not, during the time that he was employed as motorman or gripman, cars in the different cities were equipped

with fenders. This evidence was objected to as "incompetent, immaterial, and irrelevant." Counsel for respondents then, by various questions and offers which cover about ten pages of the transcript of the evidence, attempted to prove that the street cars, during the time the witness was employed as above stated, were equipped with fenders in the cities of Chicago, Omaha, Seattle, San Francisco, and Los Angeles, all of which was objected to, and the objections sustained. After counsel had made repeated offers to get into the record the evidence with regard to the use of fenders, counsel for appellants suggested that the purpose for which fenders were used was a matter of common knowledge, and not a subject of expert evidence. The court adopted this view and ruled that the purposes for which fenders were used on street cars was a matter of which judicial notice could be taken by both the court and jury. Thereupon counsel for appellants objected to any evidence with regard to the use of fenders. Their objections were sustained. No evidence upon the subject of fenders was admitted, except that the car in question was not equipped with a fender or guard of any kind. Upon this state of the record, counsel for appellants requested the court to instruct the jury that there was no evidence "that at the time of the accident guards and fenders were in general use by companies, in similar business, doing their business in a prudent manner," and that "there is no proof of negligence against the defendants, or either of them, on account of there being no fender upon the car." The court charged the jury upon this subject as follows: "If you find that such car did not have a fender, you cannot find against the defendants upon that alone, unless you find also from the evidence that, if the car had a fender, the accident might have been averted thereby." It is strenuously insisted that the refusal to instruct as requested, and that the giving of the instruction quoted above, constitutes prejudicial error. It is urged that the instruction was not based upon a subject of which there was any evidence; that by the repeated decisions of this court instructions must be based upon the evidence, and to instruct upon a subject unsupported by evidence constitutes prejudicial error. Undoubtedly such is the general rule, which has been laid down by this and many other courts.

Does the claim here made come within the rule? We do not think so, for several reasons. From what has been said it is apparent that both the court and counsel for appellant treated the purpose for which fenders were used on street cars as a matter of general knowledge. If this was the correct view, then the object, purpose, and use of fenders was in the case to be considered by the jury, as if it had been testified to by witnesses. It is elemental that any facts which are generally known and accepted, and of which courts take judicial knowledge, are part of the case as facts, and the court may instruct upon them to the same extent as upon other facts. Counsel cannot at the trial obtain rulings in their favor upon objections to evidence upon the ground that it is immaterial because the matter is one of general and common knowledge and then urge on review that there is no evidence upon the subject to support an instruction. But, apart from this, there is room for the contention that the instruction, after it was modified by the court, in effect still was merely negative. The court told the jury that they could not find against appellants upon the omission to equip the car with a fender unless they found that the accident could have been averted by the fender. When the court told the jury that they could not consider the absence of a fender unless they found that if one had been provided it would have averted the accident, he in effect told them that the fender was not in the case. All through the instructions, and in the evidence as well, where the term "accident" is used, it refers to the collision itself. If the court had used the term "collision" instead of "accident" in the instructions, all would at once agree that the presence of a fender could not have averted the collision. The fender was not calculated, like a gong or a bell, or even a headlight, to apprise one of an approaching car so as to avoid it. A fender could have been used to prevent a person colliding with the front end of the car from getting under the wheels by shoving him off the track or by carrying him along in front of the car. If the court had told the jury that a fender might be considered in case they found that it would have prevented the injuries—that is, the crushing of deceased's leg and foot

—there would be more force to counsel's contention. Even then we think the instruction would not be subject to the criticisms made of it. We do not rest our decision with regard to this assignment upon what we have said about the negative character of the instruction; what we have said was for the purpose of illustrating the point that the instruction is not necessarily open to the construction placed upon it by counsel.

Passing now to the claim made by counsel that by this instruction the jury were authorized to require from the appellants a standard of care in the conduct of their business different from that which may have been generally prevailing—that is, in view that there was no evidence in the record with regard to the use of fenders generally—the jury could not be permitted to say that not to use one on the car in question constituted negligence. It is true, as is well said in section 44 of Labatt on Master and Servant, that:

"The unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man."

This doctrine with regard to the use of safety and other appliances is approved and adopted by this court in speaking through the present Chief Justice, in the case of *Fritz v. Electric Light Co.*, 18 Utah 493, 56 Pac. 90. We have no inclination to either question the soundness of the doctrine or to modify it; but we are convinced it is not applicable to the facts in this case. It does not follow that, because it may be necessary to prove that certain appliances are in general use before negligence can be predicated upon the omission to supply them, therefore the rule applies to all appliances of whatever kind or character, or for whatever purpose used. The purpose of some appliances may be so generally known that it becomes a matter of common knowledge; and therefore the proof in that regard may be dispensed with. This may be illustrated by referring to a few only of many instances that may be named. Would any one now assert that, before one could predicate negligence on the failure to provide a head-

light on a locomotive engine during its use at night, or in failing to provide cars in use with brakes, or in providing such locomotive engines or other boilers in use with what are known as "spark arresters," proof would have to be made that such appliances are in general use? We think not, for the simple reason that the purposes of the appliances above mentioned have become so generally known that proof of the fact is wholly unnecessary. This in time will no doubt be true of some of the appliances which now require proof of general use. If this be so, does the fender, as applied to street cars, come within the category of appliances whose purposes are a matter of common knowledge? We think it does. It certainly has a clear and well-defined meaning; and its purpose has also received legal recognition. "Fender," in 19 Cyc. 489, is defined as follows: "As applied to street railway cars, a guard or protection against danger to pedestrians." In the case of *Cape May Ry. v. Cape May,* 59 N. J. Law, 403, 36 Atl. 699, 36 L. R. A. 653, in referring to the term "fenders" as used in an ordinance, where the objection was made that the use of the term "fenders," without further definition, was vague and uncertain, and for that reason the ordinance was not enforceable, it was said, "The term 'fender' is well defined and readily understood as a guard and protection against dangers," and the ordinance was accordingly enforced. If, therefore, the term "fender" has acquired a well-defined meaning in law, and its purpose is legally recognized and understood, it must be so, because this meaning is the popularly and generally accepted meaning and purpose. The law does not precede but follows the popular and general understanding with regard to such matters. We think, therefore, that in this case, in view that the negligence was predicated entirely upon the omission to provide the car with any fender or guard whatever, the court had the right to take judicial notice of the purpose of fenders as applied to street cars. Had the complaint charged negligence in the use of an improper fender, or of one not in general use, then it no doubt would have been necessary to support the allegation with proper proof by showing the kind of fenders in use generally by those

engaged in a similar business which was managed and conducted with ordinary prudence and care. But the negligence, if any, consisted in not providing any appliance whatever, the purpose of which is well known and recognized, and, this being so, the only proof that was required was to show its absence. If we are right in our conclusions, then it was for the jury to say, from all the facts and circumstances in evidence, together with the inferences to be drawn from them whether or not a fender would have obviated the injuries. Unless the jury so found, the absence of a fender was wholly immaterial. The mere fact that no fender was provided did not, and could not, have any effect one way or the other, unless the fender would have guarded and protected the deceased against injury. We remark further, that, in view of what we have said with regard to the purposes of fenders, it may well be that the street railway company can no longer excuse itself for not equipping its cars with fenders at this late date by simply pointing to the fact that others, engaged in similar business, do likewise. There are some things that it may be negligent to do, or omit to do, although all others do or omit to do them. This is well illustrated in the cases of *Webster v. Symes,* 109 Mich. 1, 66 N. W. 580, and *Ilwaco Ry. Co. v. Hedrich,* 1 Wash. 446, 25 Pac. 335, 22 Am. St. Rep. 169. We are convinced that appellants were not prejudiced in any of their substantial rights in this regard, and therefore this assignment must be overruled.

It is also claimed that the court erred in instructing the jury with regard to the duties devolving upon deceased in attempting to cross the track. In this regard the court in effect told the jury that the deceased was required to use his senses, and exercise that degree of care that men of ordinary prudence would have exercised under the particular circumstances of the case as disclosed by the evidence. It is urged that this was insufficient, because the deceased was shown to have been familiar with the surroundings and conditions prevailing at the place of the accident, and therefore the usual or ordinary test did not cover the case. We think otherwise. The court called attention to the particular circumstances of

this case, and within these were necessarily included all the
circumstances which had any bearing upon the conduct of
either party. Moreover, there is no intimation anywhere in
the record that any one made any claim that any consideration
should be based upon the fact that the deceased did not know
the conditions and circumstances surrounding him at the time
of the accident, and that he did not know the conditions gener-
ally prevailing at that place. We cannot perceive any error
in this regard.

Error is also predicated upon the instruction where the
court referred to the care the deceased was required to ex-
ercise in looking for an approaching car. In this instruction
the court used the expression of "observing the car" instead of
"looking for the car" before attempting to cross the track.
It is urged that to merely require one to observe an approach-
ing car is not sufficient; that it does not meet the duty im-
posed by law, which requires that a pedestrian, before at-
tempting to cross the track, must look to see whether or not a
car is approaching. We think the jury clearly understood
what the court desired to impress upon them in the instruc-
tion. The court repeatedly told the jury that the deceased
was required to use all of his senses, and in different instruc-
tions told them what the law required of him, and, unless
they found that he had complied with those requirements, the
respondents could not recover. In view of this the appellants
could not have been prejudiced.

Another error assigned is that the court erred in directing
the jury that a person, in attempting to cross a street railway
track, "has a right to rely upon the assumption that the com-
pany and its servants will discharge their legal duty, in ap-
proaching crossings, by having their cars under control." It
is urged that, in view that the accident did not occur at a pub-
lic crossing, therefore the instruction is not based on the evi-
dence and is contrary to law. The instruction, however; con-
tains simply an abstract statement of the law, as applied to
persons and street railroad companies, with regard to cross-
ings generally. It is true that the accident occurred at a
point some distance east of the main street crossing. But there

was an abundance of evidence which tended to show that a large number of persons habitually crossed the track at and near the place of the accident. This, in effect, widened the extent of Main street crossing, all of which had existed for a long time prior to the accident, and was well known to the street car company and its servants; and hence it became their duty to adapt the movements of the cars to the prevailing conditions and circumstances. As we have already pointed out in this opinion, no part of the public street is withdrawn from use by placing a street railway track upon it. The street thereby is merely burdened with an additional easement in favor of the street railway company, with the preferential right of passage over it. The public are not merely licensees in using that portion of the street occupied by the street railway track. They are not there by the mere permission of the owner of the street railway; but they are there as a matter of legal right, and may so remain until the street railway company desires to pass over it with one of its cars. The right of passage by the company is a preferential right to which all others must yield. But, in exercising this right, the company and its servants must have due regard for the safety of those who may be on the street, or on or near the street railway tracks. If, therefore, any considerable number of persons habitually cross the track at a certain point, it is not material that such a point is not at the regularly established crossing, in so far as it affects the care of the street railway company in passing that particular place. The right to the use of the public streets cannot be curtailed in this way. The public must have due regard for the preferential right of passage of the street cars, and must exercise the degree of care commensurate with this right; but the street car company may not say that it will not permit the use of streets except at public crossings, and that any person who attempts to use or cross them at other places does so at his peril. Both parties must so adapt their movements and conduct as will conserve the rights of all, and whether the one or the other has departed from the standard of care required at a public crossing, or on

any other part of the tracks occupying a portion of the street, is, and of necessity must be ordinarily, a question of fact. By what we have said, we do not mean that a street car company must at all points move its cars at the same rate of speed, or exercise the same vigilance, or have its cars under control to the same extent as at public crossings; but what we desire to impress is that the company must at all places exercise a degree of care which the existing conditions require, and that pedestrians, or any one using the street with horses and vehicles, must do the same. The court in no way departed from this rule in the instructions; and therefore no error was committed in giving it.

Error is also based upon the refusal of the court to charge the jury as requested by appellants in their request numbered 32. This request is to the effect that it was the duty of the deceased in approaching the track to look for an approaching car, and that, if he had looked, and by looking would have seen the car in time to have avoided the accident, but did not do so, and if the motorman did not have the last clear chance to have avoided the accident by the exercise of reasonable diligence, then the verdict should be for defendants. While this charge was not given to the jury in the exact language employed by council, we think that the substance of it was covered in several instructions given by the court. Instruction numbered 20 given covers a portion of it; and this instruction was in substance the same as requests numbered 8 and 9, asked by appellants. In view of this, the court did not err in refusing the request.

The last assignment to be noticed is directed against an instruction given in relation to the measure of damages. The instruction is a very long one, covering the whole range of matters to be considered by the jury in determining the amount to be allowed the widow and minor children for the loss sustained by them through the death of the husband and father. In the instruction is included in substance the whole of the requests upon the subject offered by appellants. The exception and argument, however, are directed against the concluding part of the instruction, which reads as follows:

"You will not consider, in fixing damages, any income from any property that the deceased had, if any, at the time of his death, produced by the property itself alone, independent of his care, skill, and supervision; but you should consider any income from any and all of his property which his skill, personal supervision, diligence, and care have a part in producing." It is strenuously argued that under this instruction the jury could have considered the profits arising out of deceased's business, and that profits arising from any business or enterprise cannot be considered in actions of this kind, unless the profits are for past losses, and then they must be specially pleaded if a recovery is sought therefor. While the phraseology of the instruction is not to be approved as a model, nevertheless, for the reasons hereafter stated, it cannot be held that it was prejudicial to the rights of appellants. It may be conceded that it frequently has been held that mere future profits, arising out of a deceased's business, cannot be considered in a case of this character. But this is so because the element of future profits is too uncertain, besides being speculative and remote. Under our statute, both the wife and the children were heirs of the deceased, and as such were entitled to recover, not only for the loss of support, companionship, and the assistance he would naturally and probably be to them but were entitled to all the pecuniary loss that they may have sustained by reason of his death, which could be established with reasonable certainty in view of all the circumstances pertaining to the subject-matter. The authorities under statutes similar to ours, we think, are clearly to this effect. In *Hayes v. Williams,* 17 Colo. 465, 30 Pac. 355, the rule or measure of damages is stated thus:

"This rule allows, as compensatory damages, the estimated accumulations of deceased during 'the probable remainder of his life, if he had not come to an accidental death, having reference to his age, occupation, habits, bodily health, and ability.' "

The rule in case of death of a husband and father is stated, in much the same terms, in section 160 of Tiffany on Death by Wrongful Act. See, also, *San Antonio & A. P. Ry. Co. v. Long,* 87 Tex. 148, 27 S. W. 113, 24 L. R. A. 641, 47

Am. St. Rep. 87. The instruction strictly limited the recovery to such accumulations as would likely be produced by the "skill, personal supervision and diligence" of the deceased, and all future income from any property the deceased owned, at the time of his death, not produced from the deceased's personal efforts, was excluded. Future profits, as such, were, therefore, not only not included, but they were expressly excluded, as an element for which a recovery could be had. The respondents in this regard were entitled to receive what they would have received if the deceased had lived. This, so far as the loss could be established with reasonable certainty, was the measure of damages. If from the evidence it appeared that the deceased's ability and habits were such as gave reasonable grounds to believe that he would accumulate property in excess of his expenditures, then his heirs were entitled to the loss so sustained by them. These losses cannot be limited strictly to a fixed sum of earnings for a day, week, or month. If absolute certainty were required, very little, if anything, could be recovereed. Matters of this kind depend on the inherent probabilities, and these were all in evidence on the part of appellants, as well as on the part of respondents; and in view of the evidence on this subject we are fully persuaded that no prejudicial error was committed, either in admitting the evidence upon the subject, or in giving the instruction complained of.

In concluding this opinion, we remark that this case has been tried three times. At the first trial the jury disagreed, and on the second trial a verdict was returned in favor of respondents, which was set aside by the trial court, and on the third trial the jury again rendered a verdict in favor of respondents, upon which the present judgment was entered. It is only fair to state that the counsel who presented the case to this court did not try it in the court below. We make this statement because the record presents exceptional features which may have arisen, in part at least, out of the theories of counsel trying the case, and which, according to their views, might not present the question in the precise form in which they have been argued before us. We have read the entire

record with more than ordinary care. There were a large number of eyewitnesses who gave their version of the accident; every feature of the case was thoroughly covered by the instructions; and in the light of the whole record we are convinced that the case was properly submitted to the jury, and that, if they have committed any error of judgment in weighing and reconciling the evidence, it is one that the law, perhaps wisely, forbids us to review.

. The judgment therefore should be, and accordingly is, affirmed, with costs to respondents.

McCARTY, C. J., and LEWIS, District Judge, concur.